**Revised July 10, 2002**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-60270

_____


RON CHRIS FOSTER

        Petitioner - Appellant

    v.

ROBERT L JOHNSON, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF
CORRECTIONS

        Respondent - Appellee

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

June 6, 2002

Before KING, Chief Judge, and SMITH and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

    Petitioner-Appellant Ron Chris Foster, a Mississippi death-

row inmate, appeals the district court's denial of his petition

for a writ of habeas corpus brought under 28 U.S.C. § 2254 (1994

& Supp. V 1999).  He raises three claims on appeal: (1) violation

of his Sixth and Fourteenth Amendment right to effective

assistance of counsel on the ground that his counsel failed to

investigate and to present available mitigating evidence, (2) violation of his Sixth and Fourteenth Amendment right to effective assistance of counsel on the ground that his counsel failed to file a motion to transfer Foster's case to juvenile court, and (3) violation of the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishments on the ground that Mississippi does not mandate particularized findings regarding the "maturity and moral culpability" of defendants under eighteen years old before they may be tried and sentenced for a capital offense as an adult. The district court granted Foster's request for a certificate of appealability ("COA") on the first claim, and he requests that this court grant COAs on the other two claims. For the following reasons, we (1) affirm the district court's judgment denying Foster's claim of ineffective assistance of counsel based on the failure to investigate and to present sufficient mitigating evidence, (2) grant a COA on the ineffective-assistance-of-counsel claim based on the failure to file a motion to transfer to a juvenile court and then affirm the district court's denial of habeas relief on that claim, and (3) deny Foster's request for a COA on the Eighth Amendment claim.

## I. BACKGROUND

On September 8, 1989, a Mississippi grand jury indicted Petitioner-Appellant Ron Chris Foster for the murder of George

2

Shelton in the course of committing armed robbery, a capital offense in Mississippi. See MISS. CODE ANN. § 97-3-19(2)(e) (2000).[1] Although Foster was only seventeen years old at the time of the alleged offense, and the Mississippi youth courts generally have exclusive jurisdiction over criminal cases brought against anyone under eighteen years of age, see MISS. CODE ANN. §§ 43-21-105(d), 43-21-151(1) (2000), the state district attorney prosecuted Foster as an adult pursuant to section 43-21-151 of the Mississippi Code, which provides that "[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death, will be in the original jurisdiction of the circuit court" rather than the youth court, id. § 43-21-151(1)(a).

Before trial, Foster's counsel, Michael Farrow, filed a motion for a psychiatric examination to determine Foster's competency to stand trial and to ascertain "any mitigating factors or circumstances which might be used by the defense in the penalty phase of the case." The motion requested that the state provide for "a full psychiatric evaluation, psychiatric history, mental and emotional history and all relevant

---

[1] The statute of conviction provides, in pertinent part: "The killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery." MISS. CODE ANN. § 97-3-19(2)(e).

3

psychiatric and physiological testing of the Defendant."[2]  After a hearing on the motion, the state trial court entered an order committing Foster to the Mississippi State Hospital at Whitfield ("Whitfield") to undergo psychiatric evaluation for the specific purposes of determining: (1) his competency to stand trial and (2) his sanity at the time of the offense.  However, the trial court "h[e]ld its ruling in abeyance on the defendant's request [for a psychiatric opinion] on mitigating evidence until such time as it [] received the report of the Physicians at [Whitfield]."

On July 20, 1990, the state trial court received a letter written by the director of forensic service at Whitfield reporting on the staff's examination of Foster (the "Whitfield report").  According to the Whitfield report, the staff had concluded that Foster "did have a rational as well as factual understanding of courtroom proceedings and would be able to assist his attorney in preparing his defense" and that "he knew the difference between right and wrong in relation to his actions at the time of the crime."  The report further stated:

---

[2]  In support of his motion for a psychiatric examination, Foster submitted an affidavit in which his parents, Stevson and Lillie Mae Foster, stated that "[d]uring the course of his life Chris (Foster) has exhibited, at times, some rather strange and bazaar [sic] behavior leading us to question his sanity and emotional health and well being."  They further stated that "[w]e . . . firmly believe that our son suffers from a substantial defect of thought, mood, and perception [and] seriously question whether, in his present mental state, our son can cooperate with his attorney in the preparation of his defense."

4

At no time during our observation of him here has Mr. Foster displayed any symptom of psychotic disorder or organic mental disorder. Our ward observations, former mental status observations, and psychological testing all supported the diagnosis of Conduct Disorder and Personality Disorder with Antisocial and Narcissistic Features. These diagnoses reflect an individual who tends to disregard the rules of society and places his own needs and desires ahead of those of other people. Mr. Foster tends to over-emphasize his own importance and prowess and minimize his responsibility for his behavior and its consequences. Because of these personality traits he may not always choose to cooperate with his attorney or with the court, but I believe that he is capable of cooperating if he chooses to. He has been involved in physical altercations both in the jail and here and this behavior may well continue.

Upon receiving the Whitfield report, the trial court did not rule on the mitigating-evidence portion of Foster's motion for psychiatric examination. However, after the Whitfield report was submitted to the court, Farrow filed a motion requesting state funding to hire a mental-health expert for the purpose of developing mitigating evidence. In a hearing on this and several other pre-trial motions on August 29, 1990, Farrow informed the trial court that he needed time to make inquiries regarding the availability and fee schedules of mental-health experts. Consequently, the trial court entered an order declining to rule at that time on Foster's motion to hire a mental-health expert.

In October 1990, Farrow filed a motion for continuance on the ground that his poor health condition (mononucleosis) precluded him from providing Foster with an adequate defense. During cross-examination by the state district attorney at the hearing on this motion, Farrow indicated that he intended to

5

present the testimony of mental-health experts as evidence mitigating against imposition of the death penalty at the sentencing phase of Foster's trial. However, Farrow never submitted information regarding the availability and fee schedules of experts or otherwise renewed his request for state funding to secure expert assistance in developing mitigating evidence. The state trial court granted Farrow's motion for a continuance, and almost three months later, on January 14, 1991, Foster's trial began without a ruling on the motion requesting funding for or appointment of a mental-health expert.

In the guilt/innocence phase of Foster's trial, the state built its case against Foster around the testimony of Vincent Harris, a co-defendant charged as an accessory to capital murder who claimed that he was with Foster on the night of the crime. Harris, who was fifteen years old at the time of the offense, testified that Foster told Harris that Foster planned to rob a convenience store by bringing some items to the cashier's counter as if to purchase them and then jumping behind the counter in an attempt to surprise Shelton (who they knew would be working at the store at this time) and then rob the store. According to Harris, he and Foster rode a bicycle to the convenience store, and Harris waited outside some distance from the store while Foster rode the bicycle the rest of the way and entered the store. Harris testified that after a short period of time, Foster came out of the store and told Harris that he had shot

6

Shelton.  According to Harris, Foster explained that as he and Shelton were struggling with each other to gain control of a gun that Shelton had pulled from behind the cashier's counter, Shelton was shot in the fray.  Harris further testified that Foster was carrying this gun when he came out of the store.  In an effort to corroborate Harris's testimony, the state introduced the testimony of various detectives and other law enforcement officials who had worked on the case and of forensic experts who had examined some of the physical evidence (e.g., the gun and fingerprints lifted from areas inside the convenience store).

Foster's defense strategy consisted mainly of attempting to implicate Harris as the perpetrator of the crime.  The investigators had retrieved the gun used to kill Shelton from Rosie Clark, Harris's mother.  By presenting her testimony and that of her husband (Harris's stepfather), William Clark, Farrow sought to bring out inconsistencies in Harris's testimony regarding how Rosie Clark had obtained the gun.  In his closing argument, Farrow also asserted that if the jurors concluded that Foster was responsible for Shelton's death, they should find Foster guilty of manslaughter because the shooting of Shelton occurred accidentally during a struggle.

On January 17, 1991, the jury found Foster guilty of capital murder.  The following day, the trial court held the sentencing phase of Foster's trial.  The state reintroduced and then rested on all of the evidence presented at the guilt/innocence stage of

7

the trial, contending that this evidence proved three of the

eight aggravating circumstances enumerated in Mississippi's

death-penalty statute:

> (1) "The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit . . . any robbery";
> (2) "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody"; and
> (3) "The capital offense was committed for pecuniary gain."

MISS. CODE ANN. § 99-19-101(5)(d)-(f) (2000). The state further

argued that Foster should be sentenced to death because these

three aggravating circumstances were not outweighed by any

mitigating circumstances.[3]

---

[3] A Mississippi jury may impose a sentence of death only if the jurors unanimously find "[t]hat there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances." MISS. CODE ANN. § 99-19-101(3)(c). Subsection (6) provides:
Mitigating circumstances shall be the following:
   (a) The defendant has no significant history of prior criminal activity.
   (b) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
   (c) The victim was a participant in the defendant's conduct or consented to the act.
   (d) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.
   (e) The defendant acted under extreme duress or under the substantial domination of another person.
   (f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
   (g) The age of the defendant at the time of the crime.
Id. § 99-19-101(6)(a)-(g).

8

Farrow argued that the state had failed to meet its burden of proving the aggravating circumstances beyond a reasonable doubt because the evidence provided a strong indication that the shooting of Shelton was accidental (and, thus, not motivated by a desire to evade legal repercussions) and because no money was missing from the store (and, thus, the shooting was not committed in the course of robbery or for pecuniary gain). Farrow further told the jury that the following mitigating circumstances outweighed any aggravating circumstances applicable in Foster's case: (1) Foster's youth at the time of the crime, (2) Foster's lack of any criminal history, (3) the "extreme emotional disturbance" that resulted from Foster's struggle with Shelton over the gun, (4) Foster's psychiatric problems of diminished "capacity to understand his acts and to conform his conduct to the requirements of the law" because of "an impulsive lack of self-control," (5) Foster's "limited intelligence" and inadequate educational background, (6) the impairment of Foster's mental capacity as a result of his prior head injuries, (7) Foster's intoxication at the time of the offense, and (8) Foster's eighteen-month-old son. Farrow further urged the jury to consider any other potentially mitigating circumstances. Farrow did not present any expert testimony to demonstrate the mitigating circumstances relating to Foster's mental health, as he had indicated was his intention during the pre-trial proceedings. Nor did he seek a ruling from the trial court on

his previous motions requesting that the state provide for a mental-health expert to assist in developing mitigating evidence for Foster. Rather, the only evidence that Farrow introduced in the sentencing phase in support of the mitigating circumstances that he had laid out for the jury was the testimony of Foster's parents, Stevson and Lillie Mae Foster ("Stevson" and "Lillie Mae"), and Foster's poor report card.[4] However, some of Stevson and Lillie Mae's testimony was inconsistent with the mitigating circumstances that Farrow told the jury were applicable in Foster's case. Specifically, Farrow asserted that Foster's problems with alcohol and his low intelligence mitigated against imposition of the death penalty. However, both Stevson and Lillie Mae testified that they were not aware of any history of alcohol abuse by their son and that Foster had been a "good student."

Stevson and Lillie Mae also attempted to convince the jury of Foster's good character. They testified that Foster had lived with them and his brother for his entire life, that he had never before been convicted of any crimes, that they were a close and religious family, and that Foster had a young son (apparently born while Foster was in state custody waiting to be tried). Both parents also testified that Foster had incurred two head

---

[4] Farrow also relied on Harris's testimony at the guilt/innocence phase of the trial that Foster had consumed twelve beers on the night of the robbery.

injuries while growing up (once by being hit with a baseball and the other time by falling off a motorcycle), after which he often behaved strangely. Before leaving the witness stand, Stevson and Lillie Mae both cried and pleaded with the jury to spare their son's life.

After deliberating for approximately one and one-half hours, the jury returned a verdict that Foster should be sentenced to death. Foster directly appealed his conviction and sentence to the Mississippi Supreme Court.[5] Foster was represented on appeal by both Farrow and James Craig. The Mississippi Supreme Court rejected all of the twenty-six claims of error raised by Foster and affirmed his conviction and death sentence. Foster v. State, 639 So. 2d 1263, 1268, 1304 (Miss. 1994) (6-3 decision) (rehearing denied on Aug. 18, 1994). Foster thereafter filed a petition for certiorari with the U.S. Supreme Court, which was denied on March 20, 1995. Foster v. Mississippi, 514 U.S. 1019, reh'g denied, 514 U.S. 1123 (1995). Although there is no formal documentation of Farrow's withdrawal as Foster's counsel in the state court records, Farrow apparently ceased his representation of Foster after the state appellate proceedings, as Craig was the sole counsel named on Foster's Supreme Court petition for certiorari, and Farrow was not involved in any of Foster's

---

[5] Mississippi's death-penalty statute provides that "[t]he judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Mississippi." MISS. CODE ANN. § 99-19-101(4).

11

subsequent attempts to obtain state post-conviction relief or federal habeas relief.

Pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, MISS. CODE ANN. §§ 99-39-1 et seq. (2000), Foster filed an application for leave to file a motion for post-conviction relief with the Mississippi Supreme Court on July 24, 1995.[6] Among the claims that Foster sought to raise in his motion for post-conviction relief was ineffective assistance of trial counsel. Foster explained in his application for leave to file this motion that he had not raised these ineffective-assistance-of-counsel claims on appeal because he was still represented by Farrow at that point. On May 16, 1996, the Mississippi Supreme Court denied Foster's application for leave to file a motion for post-conviction relief. Foster v. State, 687 So. 2d 1124, 1141 (Miss. 1996) (5-2 decision) (rehearing denied on Jan. 23, 1997). Foster sought review of this decision by the U.S. Supreme Court in a petition for certiorari, which the Court denied on June 23, 1997. Foster v. Mississippi, 521 U.S. 1108 (1997).

---

[6] Under the procedures established in the Mississippi Uniform Post-Conviction Collateral Relief Act, individuals such as Foster, whose convictions and sentences have been affirmed on direct appeal to the Mississippi Supreme Court or whose appeals to that court have been dismissed, may not file a motion for post-conviction collateral relief with the trial court until they are granted leave to do so by the Mississippi Supreme Court. MISS. CODE ANN. § 99-39-7.

On October 29, 1997, Foster filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 with the district court. In his petition, Foster raised four claims of ineffective assistance of counsel, each alleging that a certain omission by counsel was unreasonable and prejudicial: (1) Farrow's failure to investigate and present adequate mitigating evidence at the sentencing phase of Foster's trial, (2) Farrow's failure to file a motion to transfer Foster's case to youth court pursuant to section 43-21-159 of the Mississippi Code, (3) Farrow's failure to preserve a number of errors committed during trial, and (4) the failure of Foster's appellate counsel (including Farrow) to raise a claim of jury-instruction error that had been preserved at trial. In addition to these ineffective-assistance-of-counsel claims, Foster asserted that his death sentence violated the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments because he was seventeen years old at the time of the crime, and the state system did not provide a mechanism to determine whether he possessed sufficient "maturity and moral culpability" before trying and sentencing him as an adult for a capital offense.[7]

---

[7] Foster's federal habeas petition also contained a claim that the Mississippi Supreme Court failed to conduct a constitutionally meaningful review of the jury's findings of aggravating circumstances. However, the district court declined to address this claim, stating that "[c]learly, [it] is addressed to the Mississippi Supreme Court and cannot serve as a basis for relief in this court." Foster did not request a COA on this claim.

After filing his federal habeas petition, Foster filed motions requesting authorization to obtain expert assistance[8] and an evidentiary hearing,[9] both of which he asserted were necessary to present adequately his claim that Farrow had rendered ineffective assistance by failing to investigate and to present mitigating evidence. The district court denied both of these motions.

On January 4, 2001, the district court denied Foster habeas relief. After the district court denied his motion for reconsideration, Foster timely filed a notice of appeal to this court and requested a COA from the district court on each of his ineffective-assistance-of-counsel claims and his Eighth Amendment

---

[8] Where a habeas petitioner has been sentenced to death, "[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, . . . the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor." 21 U.S.C. § 848(q)(9) (2000).

[9] The Antiterrorism and Effective Death Penalty Act of 1996 permits federal habeas courts to conduct an evidentiary hearing on a claim where "the applicant has failed to develop the factual basis of [that] claim in State court proceedings" only if:
(A) the claim relies on—
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
28 U.S.C. § 2254(e)(2) (Supp. V 1999).

14

claim. The district court granted a COA on Foster's claim that he was denied effective assistance of counsel at sentencing because of Farrow's deficient performance with respect to mitigating evidence ("ineffective-assistance/mitigation claim"), but denied a COA on each of his remaining claims. Foster now appeals the district court's denial of habeas relief on his ineffective-assistance/mitigation claim and requests a COA from this court on the remaining claims raised in his federal habeas petition.

## II. FEDERAL HABEAS STANDARD OF REVIEW

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998). Because Foster filed his petition for federal habeas corpus relief after the date of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 100 Stat. 1214 (codified as amended at 28 U.S.C. § 2254 (Supp. V 1999)) ("AEDPA"), the district court's federal habeas review was governed by AEDPA. See Penry v. Johnson, 532 U.S. 782, 792 (2001).

Under § 2254(d) of AEDPA, habeas relief is not available to a state prisoner

> with respect to any claim that was adjudicated
> on the merits in State court proceedings
> unless the adjudication of the claim —
> (1) resulted in a decision that was
> contrary to, or involved an unreasonable
> application of, clearly established Federal
> law, as determined by the Supreme Court of the
> United States; or
> (2) resulted in a decision that was based
> on an unreasonable determination of the facts
> in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d) (Supp. V 1999).

The Supreme Court recently elaborated on the § 2254(d)(1) standards. See Williams v. Taylor, 529 U.S. 362, 404-13 (2000). Applying statutory construction principles, the Court determined that the phrases "contrary to" and "unreasonable application of" establish "two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." Id. at 404. According to the Court, a state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court" if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06.

The Court determined that a state court decision is "an unreasonable application of clearly established" Supreme Court

16

precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  Id. at 407-08.  The Court established two guidelines for ascertaining when an application of federal law is "unreasonable."  First, the Court indicated that the inquiry into unreasonableness is an objective one.  See id. at 409-10.  Second, the Court emphasized that "unreasonable" does not mean merely "incorrect": an application of clearly established Supreme Court precedent must be incorrect and unreasonable to warrant federal habeas relief.  See id. at 410-12.

To establish that habeas relief is warranted on the § 2254(d)(2) ground that the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," a petitioner must rebut by clear and convincing evidence the § 2254(e)(1) presumption that a state court's factual findings are correct. Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000); see also 28 U.S.C. § 2254(e)(1) (Supp. V 1999) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of

17

rebutting the presumption of correctness by clear and convincing evidence.").

### III. INEFFECTIVE ASSISTANCE OF COUNSEL IN INVESTIGATING AND PRESENTING MITIGATING EVIDENCE

As the Supreme Court has recognized, the standard governing claims of ineffective assistance of counsel established in Strickland v. Washington, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States'" for the purpose of federal habeas review under § 2254(d). Williams, 529 U.S. at 391. Accordingly, Foster is entitled to relief if the state court's adjudication of his ineffective-assistance-of-counsel claim was either contrary to or involved an unreasonable application of Strickland, or if the state court's decision is based on an unreasonable determination of the facts in light of the evidence before the court. In Strickland, the Court held that in order to establish a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must make two showings:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

18

466 U.S. at 687.  "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact."  Id. at 698.

To prevail on an ineffective-assistance-of-counsel claim, a defendant must tie Strickland's deficiency and prejudice prongs to particular instances of counsel's performance, i.e., the defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and to have rendered the result of the trial unreliable.  Id. at 690.  Foster's ineffective-assistance claim is based on Farrow's alleged failure to investigate and to present evidence that would have mitigated against imposition of the death penalty in Foster's case.

Initially, Foster contends that Farrow's performance was constitutionally deficient because Farrow failed to present existing mitigating evidence regarding Foster's mental condition. According to Foster, Farrow should have presented the Whitfield report because its diagnoses of Foster with Conduct Disorder and Personality Disorder and its determination that Foster had an IQ of 80 constituted substantial mitigating evidence.  Foster also argues that Farrow's investigation into mitigating evidence was inadequate because he failed to seek the following: (1) an expert's opinion further developing the information in the Whitfield report for purposes of mitigation and (2) further psychiatric and neurological testing and evaluation of Foster,

19

including any medical records regarding Foster's two head injuries. In support of his claims that the Whitfield report supported statutory mitigating circumstances (and thus should have been presented) and that an adequate investigation would have yielded further "mental health" mitigating evidence, Foster submitted (to the state court as well as the district court) an affidavit of Dr. Marc Zimmermann, a clinical and forensic psychologist. In his affidavit, Dr. Zimmermann highlighted the Whitfield report's findings that he concluded were evidence supporting the existence of certain statutory mitigating circumstances and recommended that Foster undergo further psychiatric and neurological testing.

Foster further argues that, in addition to failing to present and investigate this "mental health" mitigating evidence, Farrow did not adequately investigate mitigating evidence regarding Foster's family background. In support of this claim, Foster submitted affidavits of his sister, one of his brothers, three of his friends, and one of his neighbors. Each of these individuals explained his or her relationship with Foster and attested that he or she would have testified for Foster if Farrow had asked him or her to do so. Collectively, the affidavits indicated that Foster began consuming alcohol at a young age and suggested that Foster's father and two older brothers had abused alcohol as Foster was growing up.

The Mississippi Supreme Court rejected Foster's argument that he was denied effective assistance of counsel as a result of Farrow's alleged omissions. Foster v. State, 687 So. 2d 1124, 1133-34 (Miss. 1996). The court denied Foster's claim based on the "mental health" mitigating evidence on the ground that he had not established that Farrow's performance was deficient under the first prong of Strickland. See id. The court denied Foster's claim based on the "family background" mitigating evidence on the ground that any deficiency in Farrow's performance had not prejudiced the outcome of trial, as required under the second prong of Strickland. See id. at 1134. Foster contends that the district court erred in denying him relief on both of these claims. We address each of these arguments in turn.

## A. Failure to Investigate and Present "Mental Health" Mitigating Evidence

As noted above, the Mississippi Supreme Court rejected Foster's ineffective-assistance claim based on "mental health" mitigating evidence because the court determined that Foster had not established deficient performance under Strickland. Id. at 1133-34. In Strickland, the Supreme Court held that deficient performance is established by showing that, "considering all the circumstances," "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." 466 U.S. at 688. More specific to Foster's ineffective-assistance claim is the Court's holding that "counsel has a duty

to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." Id. In particular, counsel's strategic decisions not to conduct further investigation in pursuit of mitigating evidence are entitled to substantial deference under Strickland. See id. Similarly, "Strickland requires that we defer to counsel's decision not to present mitigating evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense." Moore v. Johnson, 194 F.3d 586, 615 (5th Cir. 1999). Further, this court has held that "a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999) (quoting Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997)).

The Mississippi Supreme Court determined that Farrow made "tactical" decisions not to present the Whitfield report to the jury at the sentencing phase and not to seek further "mental health" mitigating evidence. See Foster, 687 So. 2d at 1131. The court concluded that these "tactical" decisions were

22

reasonable because, according to the court, there was a significant risk that such information would harm Foster's case for a sentence of life imprisonment rather than a sentence of death.  See id.

With respect to the Whitfield report, the court determined that the information therein "would surely leave the jury with the impression that Foster knew right from wrong and [that] he could not care less about his actions or the consequences thereof."  Id.  Accordingly, the court concluded that it was reasonable for Farrow to rely on Foster's report cards in support of the "limited intelligence" mitigating factor rather than introducing the Whitfield report's determination that Foster had an IQ of 80.  Id. at 1133.

Similarly, the court concluded that Farrow's "tactical decision not to investigate psychological evidence did not deprive [Foster] of effective assistance of counsel" because Farrow "could have judged that [any such evidence] would have been harmful" in light of the information in the Whitfield report.  Id. at 1131.  Thus, the court determined that Farrow acted reasonably in relying on Foster's parents' testimony regarding Foster's two head injuries rather than seeking medical documentation of those injuries or further expert evaluation of Foster, particularly "[i]n light of the Whitfield Report which indicated that no organic mental disorder existed."  Id. at 1133.

Foster argues that the Mississippi Supreme Court's finding that Farrow made a strategic decision to cease investigation into Foster's psychiatric condition is an unreasonable factual determination warranting habeas relief under § 2254(d)(2). According to Foster, this determination is unreasonable in light of the undisputed evidence that Farrow filed motions seeking the assistance of a mental health expert for purposes of developing mitigating evidence <u>after</u> the Whitfield report was completed. Foster asserts that Farrow did not make a strategic decision not to pursue further investigation of Foster's psychiatric condition, but rather "wholly failed to follow through on this request."

The district court agreed with this argument, finding that if the Mississippi Supreme Court had known that "Farrow had moved for funds to obtain a mental health expert to aid in the mitigation phase" after the Whitfield report was completed "and that the trial court proceeded to trial without ruling and without objection from Farrow," then the Mississippi Supreme Court "would not have concluded that . . . Farrow made a reasonable decision 'not to pursue further psychological testing.'" The district court did not, however, address whether "this error in the facts" constituted an unreasonable determination of the facts in light of the evidence before the Mississippi Supreme Court.

24

In support of his challenge to the Mississippi Supreme Court's finding that Farrow made a strategic decision not to pursue further investigation into Foster's psychiatric condition, Foster relies solely on the fact that Farrow filed a motion requesting funds for expert assistance after the Whitfield report was completed. However, the fact that Farrow filed this motion does not necessarily undermine the Mississippi Supreme Court's finding that Farrow ultimately made a strategic decision to abandon this line of inquiry. The court could have determined that Farrow did not follow up on his motion for expert assistance (by submitting information on the availability and fee schedules of experts) because, after further consideration of the information in the Whitfield report, he concluded that pursuing further expert evidence would not be fruitful or that the potential detrimental effect of such information on the jury would outweigh any potential benefits.

If we were reviewing the Mississippi Supreme Court's factual finding de novo, we might be inclined to agree with Foster that Farrow's filing of the motion for expert assistance after the Whitfield report was completed indicates that his subsequent failure to pursue this motion was an omission rather than an affirmative decision not to act. However, we must presume that the state court's factual finding is correct unless Foster rebuts that presumption with clear and convincing evidence. See Dowthitt, 230 F.3d at 741. Foster does not satisfy this burden

25

merely by pointing to the fact that Farrow filed a motion for expert assistance after the Whitfield report was completed. Thus, we cannot conclude that the Mississippi Supreme Court's finding that Farrow made a strategic decision to limit his investigation of mitigating evidence was an unreasonable determination of the facts based on the available evidence.

Foster also challenges the Mississippi Supreme Court's determination that the Whitfield report was "double-edged in nature," and the court's inference therefrom that any further psychological evaluation of Foster would similarly yield "double-edged" evidence. Initially, Foster contends that reasonably competent counsel would have introduced the Whitfield report at the sentencing phase of trial. He points to Dr. Zimmermann's testimony that "[w]hile the mental disorders diagnosed at Whitfield (i.e., Conduct Disorder and Personality Disorder) would not relieve a child in Chris [Foster's] situation of responsibility for capital murder, they would support a jury finding [that] '[t]he offense was committed while the defendant was under the influence of extreme mental or emotional disturbance' and [that Foster's] 'capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired'" (both of which are statutory mitigating circumstances that Farrow stated were applicable in his argument to the jury at the sentencing phase of Foster's trial).

26

Foster further argues that Farrow's performance was deficient as a result of his failure to conduct further investigation into Foster's psychiatric condition. According to Foster, reasonable counsel would have obtained an expert (such as Dr. Zimmermann) to explain how the Whitfield report's diagnoses and IQ determination support the existence of mitigating circumstances. In support of this argument, Foster points to Dr. Zimmermann's statements (1) that Conduct Disorder and Personality Disorder "appear[] more often in children of parents with Alcohol Dependence," (2) that "[p]eople with these disorders tend to have difficulty conforming their behavior to the norms of society," and (3) that the IQ score of 80 attributed to Foster in the Whitfield report "indicates that on the day Mr. Shelton was killed Chris Foster had a mental age of less than 13 years old." Foster also argues that Farrow did not provide reasonably effective assistance because he failed to seek further expert evaluation of Foster to determine whether he suffered from "organic brain damage or other serious mental or emotional dysfunction." In support of this argument, Foster apparently relies on Dr. Zimmermann's recommendation that "a thorough neuropsychological and/or neurological evaluation should be completed [because] [b]rain damage or dysfunction may be the cause of behavior that is often labeled as Conduct Disorder and would be considered as a mitigating factor."

27

The Mississippi Supreme Court's determination that the Whitfield report and any further psychiatric evidence that might have been obtained were double-edged in nature is a factual finding that we presume correct absent clear and convincing evidence to the contrary. Cf. Dowthitt, 230 F.3d at 745 (concluding that under § 2254(d)(2), "we are bound by the state habeas court's findings that the[] records (indicating that the petitioner suffered from mental illness) included information which could have hurt [the petitioner's] case [because those] findings are clearly supported by the record"). In concluding that the Whitfield report contained damaging information justifying a conclusion that further psychiatric investigation would be fruitless and potentially harmful, the Mississippi Supreme Court appears to have relied heavily on the following language:

> At no time during our observation of him here has Mr. Foster displayed any symptom of psychotic disorder or organic mental disorder. Our ward observations, former mental status observations, and psychological testing all supported the diagnosis of Conduct Disorder and Personality Disorder with Antisocial and Narcissistic Features. These diagnoses reflect an individual who tends to disregard the rules of society and places his own needs and desires ahead of those of other people. Mr. Foster tends to over-emphasize his own importance and prowess and minimize his responsibility for his behavior and its consequences. Because of these personality traits he may not always choose to cooperate with his attorney or with the court, but I believe that he is capable of cooperating if he chooses to. He has been involved in physical altercations both in the jail and here and this behavior may well continue.

28

Foster, 687 So. 2d at 1131.  The court dismissed Dr. Zimmermann's opinion, noting that he merely reached different conclusions than the Whitfield staff regarding: (1) the potentially mitigating implications of Conduct Disorder and Personality Disorder, and (2) the need for further testing of Foster for "brain damage or dysfunction."  See id. at 1132-33.  The court concluded that reasonable counsel could have determined that the psychiatric evaluation of Foster conducted by the Whitfield staff —— involving "forty-four days of examination and observance" —— was sufficiently comprehensive to justify a conclusion that further psychiatric investigation would only lead to similarly damaging information.  Id. at 1131-32.

We cannot say that this finding by the Mississippi Supreme Court regarding the "doubled-edged" nature of the information contained in the Whitfield report and of any further psychiatric/neurological evidence is an unreasonable determination of the facts in light of the evidence before that court.  Accordingly, we presume this finding to be correct.

Foster did not provide any evidence suggesting, contrary to the Whitfield report's conclusions, that he did suffer from "organic brain damage or other serious mental or emotional dysfunction."  As the state points out, Dr. Zimmermann did not interview Foster, but rather based the opinion in his affidavit only on the Whitfield report and affidavits of Foster's family and friends.  Consequently, Dr. Zimmermann did not provide a

29

medical assessment of Foster that differed from that already presented to the trial court in the Whitfield report. Dr. Zimmermann's affidavit merely suggests that more investigation into Foster's mental condition should have taken place and expands somewhat on the Whitfield report's diagnoses and IQ determination. Further, Foster has not proffered "any kind of medical documentation evidencing that [he] changed in personality due to [his] head injuries." Foster, 687 So. 2d at 1133.

Thus, Foster has not shown that Farrow failed to find evidence of organic brain dysfunction as a result of inadequate investigation. Consequently, Foster's contention that Farrow should have investigated more and presented more mitigating evidence "essentially come[s] down to a matter of degrees." Dowthitt, 230 F.3d at 743 (internal quotations and citation omitted). We have noted that courts should be particularly cautious about "second-guessing" such questions of degree in evaluating counsel's performance under Strickland. Id.; cf. Burger v. Kemp, 483 U.S. 776, 793 (1987) (concluding that although counsel's decision not to present the testimony of a certain witness "may have been erroneous, the record surely does not permit us to reach that conclusion" because the petitioner "has submitted no affidavit from that [witness] establishing that he would have offered substantial mitigating evidence if he had testified").

Given the high level of deference that <u>Strickland</u> requires us to accord to counsel's strategic decisions, we conclude that the Mississippi Supreme Court did not unreasonably apply federal law in concluding that Foster did not establish deficient performance under <u>Strickland</u>.  Neither (1) Farrow's failure to present the Whitfield report (and thus the diagnoses and IQ determination therein) nor (2) Farrow's failure to conduct further investigation in pursuit of more evidence regarding Foster's mental condition (including expert opinions elaborating on the Whitfield diagnoses, medical documentation of Foster's head injuries, or further evaluation for "organic brain damage or other serious mental or emotional dysfunction") compels us to conclude that the Mississippi Supreme Court's assessment of Farrow's performance was objectively unreasonable.[10]  Thus, the district court correctly determined that Foster's ineffective-assistance claim based on Farrow's failure to present and investigate "mental health" mitigating evidence does not warrant habeas relief under § 2254(d).

**B.  Failure to Investigate "Family Background" Mitigating Evidence**

---

[10]  As noted above, the Mississippi Supreme Court did not address the question whether Foster was prejudiced by Farrow's alleged deficiencies.  In <u>Strickland</u>, the Supreme Court noted that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697.

The Mississippi Supreme Court apparently did not address the deficient-performance prong in denying Foster's ineffective-assistance claim based on Farrow's failure to investigate "family background" mitigating evidence, but rather denied the claim after determining that Foster was not prejudiced by the absence of such evidence at the sentencing phase of his trial. Foster, 687 So. 2d at 1134. The Strickland Court held that in determining whether a defendant challenging a death sentence was prejudiced by counsel's deficient performance, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. For the purposes of the second prong of Strickland, a reviewing court "must be confident that at least one juror's verdict would not have been different had the new evidence been presented." Loyd v. Smith, 899 F.2d 1416, 1426 (5th Cir. 1990). Under Mississippi law, a jury may not impose the death penalty unless it unanimously determines that the mitigating circumstances do not outweigh the aggravating circumstances. MISS. CODE ANN. § 99-19-101(3)(c).

In support of his claim that Farrow inadequately investigated "family background" mitigating evidence, Foster submitted affidavits of his sister, one of his brothers, three of

32

his friends, and one of his neighbors.  All of these affiants stated that they had never been contacted by Farrow and that they would have been willing to testify for Foster had they been asked to do so.  Each affiant attested to the fact that Foster's father drank frequently as Foster was growing up or that Foster, who had access to alcohol through his two older brothers, began consuming alcohol at a very young age.

Foster maintains that he was prejudiced as a result of Farrow's failure to investigate more of the available "family background" mitigating evidence because "had counsel conducted an investigation of Foster's life (beyond speaking to his parents) and interviewed potential witnesses, counsel would have uncovered a wealth of compelling mitigation evidence [on Foster's background]."  According to Foster, the affidavits of his siblings and friends indicate that "Foster's father is a habitual drunkard," that Foster "began drinking about age twelve" because of his two older brothers' "willingness to provide [Foster] with alcohol," and that his older brother was in "constant trouble with the law because of alcohol abuse."  Foster points out that the jury did not hear such evidence of alcohol abuse in his family.  In fact, Foster asserts that his parents' testimony actually harmed him because they testified that he had never had problems with alcohol, undermining Farrow's argument that the jury should consider Foster's intoxication at the time of the offense as a mitigating circumstance.

The Mississippi Supreme Court concluded that Foster had not established prejudice because he failed to show "that interviewing [these] additional witnesses would [have] produce[d] a different outcome" at the sentencing phase of Foster's trial. Foster, 687 So. 2d at 1134. In reaching this conclusion, the court found that the affidavits did not, as Foster claimed, "paint a picture of alcoholic stupor and abusive behavior." Id. The court further reasoned that "[i]t would have been a disservice [to Foster] to have friends and family brought in to explain the longstanding history of alcoholism because a jury could have inferred a high tolerance level and not credited the twelve beers as being enough to intoxicate such a hard drinker." Id.

Based on our review of the affidavits in light of Foster's arguments on appeal, we conclude that Foster has not offered the clear and convincing evidence necessary to rebut the presumption of correctness accorded to the Mississippi Supreme Court's finding that the affidavits do not establish the "alcoholic stupor and abusive behavior [that] Foster claims." Id. Accordingly, we cannot say that the Mississippi Supreme Court unreasonably applied Strickland in determining that the omission of this evidence did not prejudice the outcome of the trial. The jury was presented with — and sentenced Foster to death in spite of — mitigating evidence indicating that Foster was only

34

seventeen years old at the time of the offense, that he did not have any criminal history, that he had a young son, that he had stopped attending school in the middle of his eighth grade year and had performed poorly throughout this brief period, and that he did not carry a gun with him to the convenience store. The Mississippi Supreme Court apparently determined that if this mitigating evidence did not persuade the jury that Foster should not be sentenced to die, it is not reasonably probable that establishing a family history of alcohol abuse would have altered at least one juror's balancing determination in favor of life. We cannot conclude that this assessment was objectively unreasonable. Accordingly, the Mississippi Supreme Court's decision denying Foster's ineffective-assistance claim based on "family background" mitigating evidence does not provide a basis for habeas relief under § 2254(d). See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be the case, that course should be followed." ). The district court did not err in denying Foster habeas relief on this claim.

## IV. REQUESTS FOR CERTIFICATES OF APPEALABILITY

Although Foster apparently requests that this court issue COAs on all five of the other claims that he asserted in his federal habeas petition, he briefs only two of those claims on

35

appeal.  We consider the unbriefed claims abandoned.  Johnson v. Puckett, 176 F.3d 809, 814 (5th Cir. 1999). The two briefed claims, which we will address in turn, are: (1) that Farrow rendered ineffective assistance of counsel by failing to file a motion to transfer Foster's case to youth court because Foster was a "child" under Mississippi law at the time of the offense (the "ineffective-assistance/transfer claim"), and (2) that Foster's death sentence violates the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishments because the trial court did not make particularized findings regarding his maturity and moral culpability before he was tried and sentenced as an adult for a capital offense (the "Eighth Amendment claim").

In their district-court filings and in their briefs for this appeal, both Foster and the state treat the ineffective-assistance/transfer claim together with the Eighth Amendment claim.  Specifically, Foster claims that the Eighth Amendment violation is a result of either "systematic failure" of Mississippi's procedures or ineffective assistance of counsel. Likely in response to the parties' approach, the district court also treated these two claims together and did not fully distinguish between them.  We thus pause briefly in our analysis to clarify that, in light of the state court proceedings, these two claims must be treated separately for purposes of federal habeas review.

36

Given that Farrow was still representing Foster in Foster's direct appeal to the Mississippi Supreme Court, it is not surprising that Foster did <u>not</u> raise the ineffective-assistance/transfer claim on direct appeal; rather, he raised only the Eighth Amendment claim, challenging Mississippi's failure to require particularized findings before minor defendants are tried as adults for a capital offense. In his state application for leave to file a motion for post-conviction relief, Foster asserted the ineffective-assistance/transfer claim for the <u>first</u> time and the Eighth Amendment claim for the <u>second</u> time. The Mississippi Supreme Court declined to reach the Eighth Amendment claim on post-conviction review on the ground that the court had already adjudicated that claim in Foster's direct appeal. <u>Foster</u>, 687 So. 2d at 1135. The court did, however, address the ineffective-assistance/transfer claim. <u>See</u> <u>id.</u> Accordingly, we must treat the two claims separately on federal habeas review, looking to the Mississippi Supreme Court's decision on Foster's application for post-conviction relief (the "post-conviction decision") in evaluating the ineffective-assistance/transfer claim, and looking to that court's decision on direct appeal (the "direct-appeal decision") in evaluating the Eighth Amendment claim.[11]

---

[11] Because the district court tended to merge Foster's ineffective-assistance/transfer claim and his Eighth Amendment claim, that court, after recognizing that the post-conviction decision deemed the Eighth Amendment claim to be procedurally

37

## A. The COA Standard

We may grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (Supp. V 1999). "A 'substantial showing' requires the applicant to demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further." Styron v. Johnson, 262 F.3d 438, 444 (5th Cir. 2001) (internal quotations and citations omitted). If the habeas petitioner seeks a COA on a claim that the state court denied on a state procedural ground, the petitioner must also show that reasonable jurists would find it debatable whether the state procedural ground bars federal habeas review. Slack v. McDaniel, 529 U.S. 473, 484 (2000). In determining whether Foster has met the COA standard, we resolve all doubts in his favor, and we may consider the severity of his death sentence in our determination. Hill v. Johnson, 210 F.3d 481, 484 (5th Cir. 2000).

Both the direct-appeal decision denying Foster's Eighth Amendment claim and the post-conviction decision denying his ineffective-assistance/transfer claim rely on both state procedural grounds and federal-law grounds. While the district

---

barred, proceeded to review the post-conviction decision's denial of Foster's ineffective-assistance/transfer claim on the merits as if it were an alternative ground for the state court's denial of the Eighth Amendment claim.

court recognized that the Mississippi Supreme Court invoked both state law and federal law, the district court apparently based its denial of habeas relief only on the merits of these claims, not on the purported state procedural bar.  In this appeal, the state raises the procedural bar as a basis for denial of relief on these claims in addition to arguing that the district court correctly denied these claims on their merits.

Because federal courts must "honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law," Harris v. Reed, 489 U.S. 255, 264 n.10 (1989), we first address the "procedural" prong of the COA standard.  Accordingly, we begin our analysis of each claim by determining whether reasonable jurists would find it debatable whether the state-law ground is a constitutionally sufficient basis to preclude federal review (i.e., whether the state-law ground is "independent and adequate").

**B.    The "Independent and Adequate State Ground" Doctrine**

Federal courts are precluded from reviewing a federal claim that the state court denied on state-law grounds only if: (1) the state-law ground relied on by the state court is both "independent of the federal question and adequate to support the judgment," Coleman v. Thompson, 501 U.S. 722, 729 (1991) (emphases added), and (2) the petitioner is not able to demonstrate either that there is "cause for the default and

actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice," id. at 750. Where, as in the instant case, the state court relied both on a state procedural rule and on federal law in denying the federal claim, we "will presume that there is no independent and adequate state ground for [the] state court decision [if it] 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" Id. at 735 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). This presumption may be rebutted, and thus federal review precluded, only if the state court "clearly and expressly" stated that the state procedural ground was a basis for its decision independent of the federal-law ground. Id.; Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995).

In addition to being "independent," a state procedural ground for denial of a federal claim must be "adequate" to preclude federal habeas review of that claim. The Supreme Court recently reiterated the meaning of "adequate" for purposes of the "independent and adequate state ground" doctrine: "Ordinarily, violation of firmly established and regularly followed state rules . . . will be adequate to foreclose review of a federal claim. There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground

40

inadequate to stop consideration of a federal question." Lee v. Kemna, 122 S. Ct. 877, 885 (2002) (internal quotations and citations omitted).

**C.     Ineffective Assistance of Counsel in Failing to File a Motion to Transfer Foster's Case to Youth Court**

Foster requests a COA from this court on his claim that Farrow rendered ineffective assistance by failing to file a motion to transfer Foster's case to the youth court. As noted above, Foster did not raise this ineffective-assistance/transfer claim in his direct appeal to the Mississippi Supreme Court (as he was still represented by Farrow at that point), but rather in his application for leave to file a motion for post-conviction relief to that court. In its post-conviction decision, the Mississippi Supreme Court clearly denied Foster's ineffective-assistance/transfer claim on its merits by applying the two-pronged Strickland analysis: "[W]e must analyze the [claim] in terms of whether Farrow was reasonable for not requesting [a transfer] motion, and whether such failure resulted in prejudicing Foster's defense." Foster, 687 So. 2d at 1135. The court also, however, made reference to a purported state procedural ground in denying this claim. Specifically, the court stated that "[t]he true color of Foster's (ineffective-assistance/transfer) claim is that his death sentence is unconstitutional because he was placed in adult court without particularized findings." Id. at 1136. According to the court,

41

it had already adjudicated this claim in Foster's direct appeal and thus the claim was barred from reconsideration under the doctrine of res judicata. Id. at 1137. While in this portion of its opinion the Mississippi Supreme Court appears to equate Foster's ineffective-assistance/transfer claim with his Eighth Amendment claim (and thus to subject both claims to the state procedural bar), the court appears to recognize that the two claims are different and separate from each other elsewhere in the opinion, stating:

> [T]he issue of whether the death penalty is unconstitutional due to a lack of particularized finding in the youth court is a procedurally barred issue. We cannot consider the merits of this issue, as it was already dealt with on the direct appeal. . . . For the purposes of this petition, the only question that Foster could pose is whether Foster's trial attorney was ineffective by failing to request a transfer proceeding from circuit court to youth court, and if ineffective, whether this error prejudiced his defense.

Id. at 1135. The court then proceeded to adjudicate the ineffective-assistance/transfer claim on its merits under Strickland. See id. at 1135-36. Thus, at least in a substantial portion of its discussion of the two claims, the Mississippi Supreme Court apparently barred on res-judicata grounds only the Eighth Amendment claim (which Foster raised on direct appeal and again in the post-conviction proceedings) and deemed the ineffective-assistance/transfer claim cognizable on post-conviction review.

42

As a result of the Mississippi Supreme Court's equivocation about the basis for its decision to deny Foster's ineffective-assistance/transfer claim, that decision "fairly appears to rest primarily on federal law," or, at the very least, "to be interwoven with federal law." Coleman, 501 U.S. at 735 (quoting Long, 463 U.S. at 1040). As the Supreme Court has instructed, in such circumstances it is for the state court, not the reviewing federal court, to disentangle the federal-law ground from any state-law ground by a clear and express statement indicating that the state-law ground was a separate basis for the court's decision independent of the federal-law ground. See, e.g., id.; Harris, 489 U.S. at 263. Because there is no such statement in the Mississippi Supreme Court's opinion, federal review of Foster's ineffective-assistance/transfer claim is not barred under the "independent and adequate state ground doctrine.[12]

---

[12] The Mississippi Supreme Court invoked another state procedural rule (in addition to the doctrine of res judicata) in denying Foster's ineffective-assistance/transfer claim, but the importance of this rule to the court's decision is even less clear. The court noted that although "[n]o true new issues have been raised" by Foster's ineffective-assistance/transfer claim, "any attempt to raise a new legal theory or ground at this point would be procedurally barred" under subsection 99-39-21(2) of the Mississippi Code. Foster, 687 So. 2d at 1136. Subsection 99-39-21(2) provides, in pertinent part: "The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue." MISS. CODE ANN. § 99-39-21(2) (2000).
    The subsection 99-39-21(2) procedural bar does not preclude federal review in this case for the same reason that the res-judicata bar does not preclude review, i.e., the Mississippi

43

We now turn to the question whether reasonable jurists would find the merits of Foster's ineffective-assistance/transfer claim debatable. As noted above, the Mississippi youth courts generally have exclusive jurisdiction over criminal cases brought against anyone under eighteen years of age. See MISS. CODE ANN. §§ 43-21-105(d), 43-21-151(1). If a child is at least thirteen years old, the youth court "may, in its discretion, transfer jurisdiction of the alleged offense described in the petition or a lesser included offense to the criminal court which would have trial jurisdiction of such offense if committed by an adult." Id. § 43-21-157(1). However, under section 43-21-151, "[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death, will be in the original jurisdiction of the circuit court" rather than of the youth court. Id. § 43-21-151(1)(a). In such cases, "the circuit judge, upon a finding that it would be in the best interest of such child and in the interest of justice, may at any stage of the proceedings prior to the attachment of jeopardy transfer such proceedings to the youth court." Id. § 43-21-159(4). As the Mississippi Supreme Court pointed out, based on this statutory provision, "Mississippi law

Supreme Court's decision fairly appears to have rested primarily on federal law (or, at the very least, to be interwoven with federal law), and the court did not clearly and expressly state that the procedural bar provided a basis for the decision independent of the federal-law grounds.

44

clearly allows a person under the age of eighteen years, charged with a capital offense, to request by proper motion that the circuit court conduct a special hearing, considering the person's age, lack of prior offenses, likelihood of successful rehabilitation and other factors which favor sending the case to the youth court rather than continuing in the circuit court." Foster, 687 So. 2d at 1135 (quoting Foster v. State, 639 So. 2d 1263, 1297 (Miss. 1994)).

In reviewing Foster's application for leave to file a motion for post-conviction relief, the Mississippi Supreme Court noted that Foster "cites no authority stating that it is ineffective for counsel to not request a special hearing to determine transfer to youth court," but rather "merely states that trial counsel must not have known that this procedure was available to him, and that failure to know this constitutes a failure to know the law, and thus, is a textbook example of deficiency." Id. The court rejected this argument, reasoning that the record did not indicate that Farrow was unaware of the availability of the transfer procedure and that "the issue of whether a capital case juvenile is transferred back to a youth court is within the sound discretion of the circuit judge." Id. The court further concluded that even assuming that Farrow's failure to file a transfer motion was constitutionally deficient, that failure did not prejudice Foster. Id. at 1136. Reiterating that the decision whether "to transfer from circuit court to youth court

45

is within the sound discretion of the trial judge," the

Mississippi Supreme Court determined:

> Had Farrow requested such a finding, the trial judge
> would have found that Foster was seventeen and one-half
> years old, on the brink of eighteen years of age, and
> while he did not have any significant criminal history,
> he had a violent, selfish nature, exhibited uncooperative
> tendencies and according to the Whitfield Report, had the
> maturity to know right from wrong. . . . These elements
> will hardly send a case back to youth court.

Id. The district court determined that the Mississippi Supreme

Court's denial of Foster's ineffective-assistance-of-counsel

claim based on Farrow's failure to file a transfer motion did not

warrant federal habeas relief under § 2254(d).

As stated above in Part III, deficient performance is

established if it is shown that, considering all the

circumstances, counsel's representation is objectively

unreasonable under prevailing professional norms. Strickland,

466 U.S. at 688. The Strickland Court recognized that

"[p]revailing norms of practice as reflected in American Bar

Association standards and the like are guides to determining what

is reasonable." Id. at 688 (internal citations omitted). The

American Bar Association's standards regarding transfer from

juvenile court to adult court are based on a recognition of the

"critical nature of the transfer decision." A.B.A. JUVENILE JUSTICE

STANDARDS § 8.2(b) cmt. (1990). For example, the standards

provide that "[i]n any case where transfer (from juvenile court

to adult court) is likely, counsel should seek to discover at the

earliest opportunity whether transfer will be sought and, if so, the procedure and criteria according to which that determination will be made." Id. § 8.2(a). Further, counsel "should promptly investigate all circumstances of the case bearing on the appropriateness of transfer," including, "[w]here circumstances warrant, [the filing of a] prompt[] mo[tion] for appointment of an investigator or expert witness to aid in the preparation of the defense [against transfer]." Id. § 8.2(b); see also id. § 8.2(b) cmt. ("As at adjudication and disposition, a lawyer cannot provide effective assistance on the basis of brief familiarity with the case and the client's circumstances.").

Although the American Bar Association's standards directly address only the situation where a minor defendant must be prepared to argue that a transfer from juvenile court to an adult court is inappropriate, the concerns underlying these standards are equally relevant in the situation where a minor defendant in adult court has the opportunity to argue that transfer to juvenile court is appropriate. Cf. Girtman v. Lockhart, 942 F.2d 468, 476 (8th Cir. 1991) ("If transferring an offender to adult court without a hearing or a statement of reasons violates due process, it logically follows that keeping a juvenile offender in adult court without holding a transfer hearing or making oral or written findings also violates due process."). Just as it is clearly in the minor's best interest that counsel make every effort to prevent a transfer from juvenile court to adult court,

47

it is clearly in the minor's best interest that counsel make every effort to secure a transfer from adult court to juvenile court. At least in the circumstances of the instant case, there is no conceivable strategic justification for forgoing available procedures for obtaining a transfer to juvenile court, and thus this omission is not entitled to Strickland deference.

In light of the foregoing and of the severity of the death penalty, we resolve any doubts in favor of Foster and grant his request for a COA on his ineffective-assistance-of-counsel claim based on Farrow's failure to file a motion to transfer the case to juvenile court. Further, given the American Bar Association's Juvenile Justice Standards and our conclusion that Farrow's decision not to file a motion to transfer to the youth court was not strategic, we have some concern about the reasonableness of the Mississippi Supreme Court's determination that Farrow's performance was not deficient. However, we need not decide the deficient-performance issue because we cannot say that the Mississippi Supreme Court's determination that Foster was not prejudiced by Farrow's failure to file the motion involved an unreasonable application of clearly established Supreme Court law or was based on an unreasonable determination of the facts in light of the available evidence. Cf. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

The Mississippi Supreme Court did not unreasonably apply Strickland or any other clearly established Supreme Court law in determining that, given Foster's age and the Whitfield report's findings, it was not reasonably probable that the outcome would have been different (i.e., that the trial court would have granted a transfer motion) if Farrow had filed a transfer motion. Accordingly, we affirm the district court's denial of relief on the ineffective-assistance/transfer claim.

**D.    Claim That the Eighth Amendment Requires That Particularized Findings Be Made Before Juveniles May Be Tried as an Adult for a Capital Offense**

Foster also requests a COA from this court on his claim that his death sentence constitutes cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments because the trial court did not make a particularized finding that he was sufficiently mature and morally culpable before he was tried and sentenced as an adult for a capital offense. In affirming his conviction and sentence on direct appeal, the Mississippi Supreme Court denied this claim as procedurally barred on the ground that Foster had failed to raise it in the trial court. Foster v. State, 639 So. 2d 1263, 1295 (Miss. 1994). In the alternative, the court denied the claim on its merits. Id. at 1297-98 ("Even if Foster's claim[] [that 'it was unconstitutional not to have a certification procedure in death cases under Mississippi law for persons under 18 years of age'] were not barred because of his

49

failure to raise [it] in the trial court . . ., we would still find th[is] issue[] to be totally without merit.").

We conclude that the language in the Mississippi Supreme Court's opinion indicating that Foster's Eighth Amendment claim "is procedurally barred and, alternatively, found to be without merit," id. at 1298, constitutes a sufficiently "clear and express" statement that the procedural ground was an independent basis for that court's decision. Corwin v. Johnson, 150 F.3d 467, 473 (5th Cir. 1998) ("It is clear in this Circuit that alternative rulings do not operate to vitiate the validity of a [state] procedural bar that constitutes the [state court's] primary holding."); cf. Sochor v. Florida, 504 U.S. 527, 534 (1992) (holding that the state court had expressed the independence of the state procedural ground with the "requisite clarity" by stating that "[n]one of the complained-of jury instructions were objected to at trial, and, thus, they are not preserved for appeal," even though the state court also noted that "[i]n any event, [the] claims . . . have no merit").

Foster does not argue that the procedural rule applied by the Mississippi Supreme Court to his Eighth Amendment claim —— i.e., the requirement that a defendant must raise claims in the trial court in order to preserve them for appellate review —— is inadequate. Nor do we find this preservation rule to be inadequate —— either as a general matter or as applied in Foster's case. A review of Mississippi appellate cases indicates

50

that the preservation rule is firmly established and regularly applied to claims alleging a violation of the "Cruel and Unusual Punishments" Clause of the Eighth Amendment (via the Fourteenth Amendment).  See, e.g., Wilcher v. State, 697 So. 2d 1087, 1108 (Miss. 1997); Holly v. State, 716 So. 2d 979, 985 (Miss. 1993); Taylor v. State, 452 So. 2d 441, 450 (Miss. 1984); McCormick v. State, 802 So. 2d 157, 161-62 (Miss. Ct. App. 2001); Coleman v. State, 788 So. 2d 788, 793 (Miss. Ct. App. 2000).

Thus, the state preservation rule is an independent and adequate state ground for the Mississippi Supreme Court's denial of Foster's Eighth Amendment claim.  Foster argues that federal review is nevertheless proper on grounds of "cause and prejudice."  Specifically, he maintains that we should not recognize the state procedural bar because his counsel rendered ineffective assistance in failing to file a motion to transfer his case to youth court.  However, the Mississippi Supreme Court based its denial of Foster's Eighth Amendment claim on his counsel's failure to raise the claim in the trial court, not on his counsel's failure to file a transfer motion.  See Foster, 639 So. 2d at 1295.  Foster does not argue that federal habeas review is appropriate notwithstanding his procedural default because his counsel rendered ineffective assistance by failing to raise the Eighth Amendment claim in the trial court.

Thus, we conclude that reasonable jurists would agree that federal review of Foster's Eighth Amendment claim is precluded

51

under the "independent and adequate state ground" doctrine. Given this conclusion, it is unnecessary for us to address whether reasonable jurists would find the merits of the claim debatable. Cf. Dowthitt, 230 F.3d at 753 n.30 ("As we find that the first prong of the Slack inquiry for procedural claims has not been met, we do not need to address the second prong."). We thus deny Foster's request for a COA on his Eighth Amendment claim.

## V. CONCLUSION

For the foregoing reasons, we (1) AFFIRM the district court's denial of habeas relief on Foster's claim of ineffective assistance of counsel based on the failure to investigate and to present mitigating evidence; (2) GRANT Foster's request for a COA on his claim of ineffective assistance of counsel based on the failure to file a motion to transfer his case to youth court and AFFIRM the district court's denial of habeas relief on that claim; and (3) DENY Foster's request for a COA on his Eighth Amendment claim.