United States Court of Appeals
Fifth Circuit

**F I L E D**

June 9, 2003

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-41279
_____

JAMES LEE HENDERSON,                          Petitioner - Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,                       Respondent - Appellee.


---------------------
Appeal from the United States District Court for the
Eastern District of Texas, Tyler

---------------------

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

James Lee Henderson was convicted of capital murder by a Texas jury and was sentenced to death. He appeals the district court's denial of habeas relief on his ineffective assistance of counsel claims. In addition, he requests a certificate of appealability ("COA") from this court for his claims that the prosecution knowingly presented perjured testimony and failed to disclose exculpatory information to the defense. We AFFIRM the denial of habeas relief and DENY a COA.

I

On the night of October 28, 1993, Henderson, Willie Pondexter, Deon Williams, and Ricky Bell decided to break into the home of 85-

year-old Martha Lennox in Palestine, Texas. They planned to rob her, steal her car, and go to Dallas. They went to her home, kicked the door open, and went upstairs. Henderson fired a shot through Lennox's bedroom door. After Williams took seven dollars from Lennox's wallet, Henderson shot Lennox in the head. Pondexter then took the gun from Henderson and shot Lennox in the head. The medical examiner testified that both wounds were fatal and that either wound could have caused Lennox's death.

After robbing and murdering Lennox, the group drove her Cadillac to the home of Pondexter's cousin, where they celebrated the theft and murder. Then they took Lennox's car to Dallas, where Williams and Henderson robbed some young Mexican men. The police arrested Pondexter and Bell, who were in Lennox's car. Henderson and Williams fled on foot. The police subsequently apprehended Williams. A short time later, Henderson saw Lennox's car being towed away and called "911" to report that it had been stolen. Henderson was arrested by the Dallas police officer to whom he made the report about the stolen car. When he was arrested, Henderson was in possession of a gun that was later determined to be the murder weapon.

Williams, who was sixteen years old at the time of the murder, testified at Henderson's trial, as follows: He had been charged with capital murder but had entered into a plea agreement in which he agreed to plead guilty to a reduced charge of murder and to

2

testify against his co-defendants.  He was to receive a sixty-year sentence for murder, and would be eligible for parole after serving thirty years.  If he had been convicted of capital murder, he was not eligible for the death penalty because of his age, but he would have to serve forty years before becoming eligible for parole.

Williams testified further regarding the events surrounding the murder:  Henderson and Pondexter were members of the "107 Hoovas," which is part of the Crips gang.  Before the murder, they were talking about "which Crip had the heart" to rob Lennox.  On his way out of Lennox's bedroom after the robbery, he heard a gunshot and looked back.  He saw Lennox's head slumped over.  Henderson had the gun in his hand and was handing it to Pondexter, who took it and shot Lennox in the head.  After they went to Pondexter's cousin's house, Henderson and Pondexter were talking about how they "smoked a bitch for her car," and they did the "Crip handshake."  On the way to Dallas in Lennox's car, Henderson and Pondexter were talking about "true Crips to the heart," and they listened to a tape of gangster songs over and over.  While he and Henderson were in the same jail, Henderson told him that the reason he shot Lennox was "because she was looking at him like he had shit on him."

Pondexter's girlfriend testified that she had heard Henderson talk about being in a gang.  When asked about the meaning of a teardrop tattoo under a person's eye, she testified that she had

3

always known it to mean that the person had killed someone. She testified further that Henderson did not have a teardrop tattoo under his eye on the night of the murder.

Joe Scott, who had shared a cell with Henderson, testified that Henderson told him repeatedly that he had shot Lennox.

The jury convicted Henderson of capital murder.

At the punishment phase, Williams testified that Henderson robbed some Mexican males in Dallas at gunpoint. He testified further that a teardrop tattoo is a sign that you have killed someone; that Henderson did not have a teardrop tattoo before the murder; but that Henderson had a teardrop tattoo when he saw him in jail following the murder; and that Henderson said that he got the tattoo in the county jail in Dallas, after the murder. Williams testified that Henderson told him that he killed Lennox because she looked at him "like he had shit on him" and that, if he had not gotten caught, he was going to go on a "killing spree." On cross-examination, Williams testified that he was charged with aggravated robbery in Dallas County. When asked whether the aggravated robbery charge was part of the deal in which he agreed to testify at Henderson's trial, Williams responded, "I don't know."

Also at the punishment phase, the court granted the State's request that Henderson step before the jury so that the jurors could see the teardrop tattoo beneath his left eye.

4

In his closing argument at the punishment phase, the prosecutor stated that, if the jury spared Henderson's life, they were "going to send this gangster-wannabe to gang heaven." The prosecutor also characterized the teardrop tattoo as a trophy that was going to make Henderson a hero in prison.

The jury answered the special issue regarding future dangerousness affirmatively and answered the special issue regarding mitigating evidence negatively. Henderson was sentenced to death. His conviction and sentence were affirmed on direct appeal. Henderson v. State, No. 71,928 (Tex. Crim. App. 1996) (unpublished). He did not file a petition for writ of certiorari.

When Henderson filed his initial state habeas application in August 1997, he was represented by Pamela Campbell, who died prior to the federal habeas proceedings. The state courts denied relief on his ineffective assistance of counsel claims, and the Supreme Court denied his petition for a writ of certiorari. Ex parte Henderson, No. 37,658-01 (Tex. Crim. App.), cert. denied, 525 U.S. 1004 (1998).

In August 1998, the federal district court appointed counsel for Henderson. In October 1998, the district court stayed Henderson's execution, which was set for December 2, 1998, and set a deadline for the filing of his federal habeas petition.

In December 1998, Henderson's federal habeas counsel's investigator obtained a series of sworn statements from Williams in

5

which Williams recanted much of his trial testimony. In those statements, Williams claimed that he never saw Henderson shoot Lennox, never heard Henderson state that he was going to kill some Mexicans in Dallas, and never heard Henderson say that he was going on a killing spree if he had not gotten caught. Williams stated that he testified falsely at trial regarding gang membership and symbols and that he testified against Henderson only because the prosecutors had threatened him with the death penalty if he did not do so.

The federal habeas proceedings were held in abeyance while Henderson's federal habeas counsel filed a subsequent application for state habeas relief in which Henderson claimed, for the first time, that the State knowingly presented perjured testimony, based on Williams's recantation of his trial testimony. The state courts dismissed the application for abuse of the writ. Ex parte Henderson, No. 37,658-02 (Tex. Crim. App. 1999) (unpublished).

Henderson then filed an amended petition for federal habeas relief. The district court conducted an evidentiary hearing, at which Williams, the prosecutors, Henderson's trial counsel, and others testified. Consistent with the statements given to federal habeas counsel's investigator, Williams testified at the federal habeas evidentiary hearing that he had not told the truth when he testified at Henderson's trial, and that he had testified falsely

6

at trial because he wanted to please the prosecutors and get a better deal for himself.

Immediately prior to the hearing, the State turned over its trial file to Henderson's federal habeas counsel, who had requested it only a few days earlier. Among the documents in that file were notes made by the prosecutors and Williams's "Plea Negotiation Agreement," which included a provision granting him derivative use immunity.[1] The Plea Negotiation Agreement was signed by Williams, Williams's trial counsel, Clayton Hall, and Red River County prosecutor Jack Herrington, and it was dated May 9, 1994, the first day of jury selection in Henderson's trial.

Henderson filed a post-hearing brief in which he asserted a claim based on the State's failure to disclose the derivative use immunity provision in Williams's plea agreement. Henderson claimed that the derivative use immunity provision would have barred Williams's prosecution for the aggravated robbery in Dallas and the unauthorized use of Lennox's vehicle. Henderson also claimed that the prosecutor's notes reflected that Williams did not talk about Henderson's gang affiliation until after he was promised derivative use immunity.

---

[1]The clause provided that the prosecution would "not use any evidence or testimony furnished under the provision of this agreement or any other type of evidence derived directly or indirectly from the defendant in any criminal prosecution against said defendant except perjury, aggravated perjury or contempt."

The district court denied habeas relief, but granted a COA for two issues: (1) whether trial counsel rendered ineffective assistance by failing to move for a mistrial at the close of the State's case-in-chief after the prosecutor had failed to introduce into evidence the two incriminating statements by Henderson to which the prosecutor had referred in his opening statement; and (2) whether trial counsel rendered ineffective assistance by failing to object to the introduction of gang evidence at the guilt-innocence phase of trial. Henderson seeks a COA for one additional issue encompassing two sub-claims: Whether the prosecution knowingly presented perjured testimony and whether the prosecution had failed to disclose exculpatory information to the defense.

## II

We will address first those claims for which the district court granted a COA, and then consider Henderson's request for a COA.

## A

### Standard of Review

We review the district court's factual findings for clear error and its legal conclusions de novo, applying the same standard of review to the state court's decision as the district court. Ladd v. Cockrell, 311 F.3d 349, 351 (5th Cir. 2002); Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998). Henderson argues that the district court erred by applying the deferential standard of review

8

set forth in <u>Drinkard v. Johnson</u>, 97 F.3d 751 (5th Cir. 1996). As Henderson notes, the Supreme Court rejected that standard in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), decided more than a year prior to the district court's opinion. Although Henderson is correct, the district court's error is harmless, because Henderson is not entitled to relief under the correct standard of review.

Because Henderson filed his federal habeas petition after the effective date of the Anti-terrorism and Effective Death Penalty Act (AEDPA), AEDPA governs our review of his claims. With respect to those claims that were adjudicated on the merits in state court, Henderson is not entitled to relief unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. at 412-13. A decision "involve[s] an unreasonable

9

application of [] clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court's findings of fact are presumed to be correct unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As we explained in Neal v. Puckett, 286 F.3d 230, 235 (5th Cir. 2002) (en banc), cert. denied, 123 S.Ct. 963 (2003), "[i]n the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural." When the state court's decision is unclear, "we determine, on a case by case basis, whether the adjudication was on the merits." Singleton v. Johnson, 178 F.3d 381, 384 (5th Cir. 1999). In making that determination, we consider three factors: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits." Id. Under Texas law, "usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a

10

claim." Id. AEDPA's standards apply, however, when the state's highest court rejects a claim without giving any indication of how or why it reached that decision. See Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999), aff'd, 528 U.S. 225, 237 (2000).

With respect to claims that were not adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. See Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002) (if state court misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, AEDPA's deferential standards of review are inapplicable). Instead, we review those claims under pre-AEDPA standards of review. See Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits); see also Chadwick v. Janecka, 312 F.3d at 605-06; Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001); Weeks v. Angelone, 176 F.3d at 258.

B

Ineffective Assistance of Counsel

Henderson claims that his trial counsel rendered ineffective assistance in two respects: First, by failing to move for a mistrial at the close of the prosecution's case-in-chief; and, second, by failing to object to the admission of gang-related evidence during the guilt-innocence phase of trial.

11

"To establish an ineffective assistance of counsel claim, [Henderson] must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense." Neal v. Puckett, 286 F.3d at 236 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "Counsel's performance is considered deficient if it 'falls below an objective standard of reasonableness' as measured by professional norms." Id. (quoting Strickland, 466 U.S. at 688). "In scrutinizing counsel's performance, we make every effort to eliminate the distorting effects of hindsight, and do not assume that counsel's performance is deficient merely because we disagree with trial counsel's strategy." Id. (internal quotation marks and citations omitted). "To establish prejudice, [Henderson] must show that there is at least 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 241 (quoting Strickland, 466 U.S. at 694). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id.

1

Ineffective Assistance:  Failure to Move for Mistrial

Henderson gave two statements to police after his arrest. In the first, he denied any involvement in the murder, but used an alias, "Johnny Leeon Mack." In the second statement, he admitted that he shot Lennox in the jaw after Pondexter had shot her in the

12

head.  He also stated, "I said that I was going to see who had heart, who was the bravest."  Prior to trial, the state trial court, after conducting an evidentiary hearing, denied Henderson's motion to suppress the statements.  In his opening statement, the prosecutor made the following remarks regarding Henderson's statements:

>        We're going to show you more.  We're going to show you a couple of statements from the defendant, himself.  We're going to show you the first statement he gave immediately after being arrested in Dallas and after the discovery of Mrs. Lennox's body; and I'm going to tell you, folks, we'll offer the statement to you but the evidence is going to show it's a bunch of lies.  That the defendant lied about his involvement.

>        We're going to show you a second statement the defendant gave about three months later, in December of 1993, and in that statement the defendant admits, only to a point, his involvement in this case.  He admits in his statement that he shot Mrs. Lennox through the face, through the jaw.  Of course in that statement he says, "I did it after Willie Poindexter shot her through the brain," but that's a lie.  It didn't happen that way and the physical evidence and the other evidence you hear in this case will prove to you that that was a lie and that James Lee Henderson fired the first shot.

>        One thing, one note I want to make about that second statement.  There are certain things in the law that prohibit certain evidence from coming in, and we're all bound by that.  The State of Texas will offer that second statement, but part of it will be blacked out.  The law allows us to do that--in fact, compels us to do that.  Ultimately, you may or may not find out what the rest of that says, but that is none of your concern at this

13

particular phase of the trial, so you will see in that second statement parts that are blacked out. Please do not try to guess what that second statement--what that blacked-out part says. I think it will become apparent to you eventually but for the purposes of the guilt-innocence part of this trial, please do not concern yourselves with the blacked-out portion. I just want to warn you. The State is not trying to hide anything from you. We're just following the rules.

Although the state habeas trial court found, and the parties state, that the trial court subsequently ruled that Henderson's statements were inadmissible, the Texas Court of Criminal Appeals held that the state habeas trial court's finding was not supported by the record. In any event, Henderson's statements were not admitted into evidence.

Henderson's argument is that his trial counsel rendered ineffective assistance by failing to move for a mistrial at the close of the State's case-in-chief, based on the fact that the prosecutor, in his opening statement, detailed to the jury two incriminating statements Henderson gave to the police, but yet those statements were never introduced into evidence. He asserts that, because the motion for mistrial would have been made outside the presence of the jury at the close of the evidence and after the court had ruled that the statements were inadmissible, the omission cannot be excused as trial strategy. He maintains that he was prejudiced, because the purported statements corroborated his cellmate's testimony regarding his admissions that he had shot

14

Lennox, which the jury may otherwise have concluded was not credible. He also argues that the prosecutor's allegations that he had lied to the police and that there was other evidence that the jury was not allowed to hear changed the culpability balance in the punishment phase of the trial. Finally, he argues that, if counsel had moved for a mistrial, and if the trial court had denied the motion, there is a reasonable probability that the Texas Court of Criminal Appeals would have reversed his conviction and sentence and remanded the case for a new trial.

There has been a problem in this case of the courts misconstruing this argument. First, the state habeas court misconstrued Henderson's claim as being based on trial counsel's failure to object to the prosecutor's opening statement. Based on that mistaken interpretation, the state court concluded that an objection to the prosecutor's opening statement would have been futile because the trial court had ruled that the statements were admissible; therefore, counsel did not render deficient performance by failing to object to the prosecutor's opening statement. The state court concluded that, even assuming deficient performance, Henderson could not show prejudice because there was extensive evidence corroborating his guilt, including his confession of involvement to his cellmate, Scott. The state court found further that the failure to object may have been trial strategy because

15

counsel did not want to call attention to the confessions, including Henderson's admissions to his cellmate, Scott.

Henderson notes that the two justifications advanced by the state trial court for the failure of counsel to object -- futility and not wanting to draw the jury's attention to the confessions -- have no relevance to his actual claim that trial counsel performed deficiently by failing to move for a mistrial, outside the presence of the jury, at the close of the State's case.

Henderson contends that, because the state courts misconstrued his claim that he was denied effective assistance of counsel when his trial counsel failed to move for a mistrial, AEDPA's standard of review applies only to the prejudice prong of his claim, and not to the deficient performance prong. We agree. The state courts did not address Henderson's actual claim of deficient performance -- counsel's failure to request a mistrial at the close of the State's evidence. Instead, misconstruing his claim, they considered only whether counsel rendered deficient performance by failing to object during the prosecutor's opening statement. Thus, although Henderson exhausted his claim by properly presenting it to the state courts, the state courts did not adjudicate the claim on its merits. Accordingly, AEDPA's standards of review are inapplicable to the deficient performance prong of this ineffective assistance claim. See Chadwick v. Janecka, 312 F.3d at 606 (AEDPA standards of review inapplicable when state court misconstrues

16

nature of properly exhausted claim and thus fails to adjudicate that claim on the merits); Jones v. Jones, 163 F.3d at 299-300 (applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits).

Henderson asserted the same claim in his federal habeas petition. However, in the district court the State only addressed Henderson's actual claim -- that counsel should have moved for a mistrial at the close of the prosecution's case-in-chief -- for the first time in its supplemental answer and motion for summary judgment filed in the district court. The State asserted that, because the prosecutor's conduct in failing to introduce Henderson's statements was not improper, defense counsel did not perform deficiently by failing to move for a mistrial. The State contended further that, because of the extensive evidence of Henderson's involvement in the crime, Henderson was not prejudiced. This evidence included his repeated admissions to his cellmate (Scott) that he committed the murder. Furthermore, the prosecutor's failure to introduce the statements was not such egregious prosecutorial misconduct that it would have necessitated a mistrial.

Still yet, the district court misconstrued Henderson's claim. It held that counsel's performance was not deficient because any objection to the prosecutor's opening statement would have been

17

futile in the light of the state court's earlier ruling that Henderson's statements were admissible. The district court concluded that Henderson was not prejudiced in the light of the weight of the evidence against him and because of Scott's testimony concerning Henderson's admissions that he had shot Lennox.

As we have noted, because the state courts failed to address the merits of Henderson's actual claim that counsel's performance was deficient, we owe no deference to the state court's determination of the first prong of Henderson's Strickland claim. However, even if we assume that Henderson's counsel rendered deficient performance by failing to move for a mistrial at the close of the State's case-in-chief, Henderson has not demonstrated that the state courts' ultimate decision on his Strickland claim, i.e., that he was not prejudiced, is unreasonable. He has not shown that there is a reasonable probability that the trial court would have granted a mistrial had counsel requested one. Furthermore, considering the overwhelming evidence of Henderson's guilt, and especially in the light of Scott's testimony regarding Henderson's repeated admissions that he shot Lennox, Henderson has not shown that there is a reasonable probability that the prosecutor's remarks affected the outcome of either the guilt-innocence phase or the punishment phase of his trial. Finally, he has failed to demonstrate that there is a reasonable probability that, if a motion for mistrial had been made and denied, the Texas

18

Court of Criminal Appeals would have reversed his conviction and sentence on appeal. We thus find no reversible error in the district court's denial of habeas relief for this <u>Strickland</u> claim.

2

<u>Ineffective Assistance: Failure to Object to Gang Evidence</u>

Henderson next contends that his trial counsel rendered ineffective assistance by failing to object to gang-related evidence at the guilt-innocence phase of trial. Henderson maintains that he was prejudiced because the prosecutor had no other theory concerning his motive for committing murder and would have found it difficult to convince the jury that the crime occurred as alleged absent a motive that made sense. He contends further that his appellate counsel rendered ineffective assistance by failing to raise on appeal the error in admitting this evidence at the guilt-innocence phase of trial.[2] He argues that the failure to preserve this error prejudiced him on appeal because the error is not harmless.

The state habeas trial court concluded that Henderson's gang affiliation properly related to Henderson's motive and intent and was a proper subject of direct examination; therefore, Henderson's

---

[2]On direct appeal, Henderson's appellate counsel argued that the evidence regarding Henderson's teardrop tattoo was irrelevant to punishment. The Court of Criminal Appeals rejected that argument, and held that "any complaint concerning the testimony given in the guilt/innocence stage is waived on appeal for lack of adequate briefing." <u>Henderson v. State</u>, No. 71,928 (Tex. Crim. App. 1996), at 18.

19

trial counsel did not render deficient performance by failing to make a futile objection. The state court concluded further that, even assuming counsel could have properly objected, Henderson was not prejudiced because of the overwhelming evidence of his guilt. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions.

In his federal habeas, Henderson's trial counsel testified, through a deposition, that he had a tactical reason for not objecting to the gang evidence: He was trying to put the witness Williams in the position of appearing to the jury to be the worst of them all, and not credible. The State argued in district court that, because of the overwhelming evidence of guilt, Henderson's complaint that counsel was ineffective for failing to object to the admission of gang evidence did not prejudice him.

The district court held that counsel should have objected to the gang evidence because it was clearly prejudicial and arguably inadmissible under state rules of evidence. Moreover, the Texas Court of Criminal Appeals had held that it was error to admit the same evidence in Pondexter's capital murder trial (although that court concluded that the error was harmless). See Pondexter v. State, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996). The district court stated, however, that it must give great deference to the trial court's determination because there is no clearly established federal law on the admissibility of this type of evidence. The

20

district court concluded that, even assuming deficient performance, Henderson was not prejudiced because there is not a reasonable probability that the jury's verdict would have been different without the gang evidence.

We conclude that the state court's decision that Henderson was not prejudiced by counsel's failure to object is not an unreasonable application of Strickland. Even assuming that counsel should have objected, and assuming further that the objection would have been sustained, there is not a reasonable probability that the jury would have acquitted Henderson. As the state court correctly observed, the evidence of Henderson's guilt was overwhelming. Considering the brutal and senseless nature of the crime, the evidence of Henderson's utter lack of remorse, and the extremely strong evidence of his guilt, including his confession to his cellmate, there is not a reasonable probability that the evidence of Henderson's gang affiliation affected the outcome of the guilt-innocence phase of his trial.[3]

C

Procedurally Defaulted Claims (COA Request)

---

[3]In his reply brief, Henderson argues that he established at the federal writ hearing that his cellmate testified falsely at trial. The district court made no such finding, however. Instead, the district court held that there was no factual basis for Henderson's claim that the prosecution knowingly sponsored the false testimony of Scott. Moreover, Henderson did not request a COA to appeal the district court's ruling with respect to his claim that the prosecution knowingly presented false testimony by Scott.

21

Relying on Williams's recanting statements and his testimony at the federal habeas evidentiary hearing, Henderson requests a COA from this court for his claim that the prosecutors knowingly presented the perjured testimony of Williams. He also seeks a COA for his claim that his due process rights were violated by the prosecution's failure to disclose the derivative use immunity provision in Williams's plea negotiation agreement. Henderson argues that the benefit Williams received as the result of the reduced charge and 60-year sentence for Lennox's murder would have been completely negated had he not been granted immunity from prosecution for the aggravated robbery in Dallas and the unauthorized use of Lennox's vehicle, because he could have been sentenced to life in prison without parole had he been convicted of those crimes. He thus contends that the derivative use immunity provision of the plea agreement was a significant benefit that should have been disclosed to the defense.

Henderson did not raise these claims on direct appeal or in his initial state habeas application. The Texas Court of Criminal Appeals held that these claims, presented for the first time in Henderson's second state habeas application, were barred by the Texas abuse of the writ doctrine. The district court therefore held that the claims were procedurally defaulted, and further denied Henderson's request for a COA on these claims.

Henderson now requests a COA from this court. "[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003). To obtain a COA, Henderson must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Miller-El, 123 S.Ct. at 1039; Slack v. McDaniel, 529 U.S. 473, 483 (2000). To make such a showing, he must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1039 (quoting Slack, 529 U.S. at 484). Because the district court held that these habeas claims were procedurally barred, Henderson must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

In Miller-El, the Supreme Court instructed, as it had previously held in Slack, that we should "limit [our] examination to a threshold inquiry into the underlying merit of [the petitioner's] claims." Miller-El, 123 S.Ct. at 1034. The Court observed that "a COA ruling is not the occasion for a ruling on the

23

merit of petitioner's claim...." Id. at 1036. Instead, our determination must be based on "an overview of the claims in the habeas petition and a general assessment of their merits." Id. at 1039. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. We do not have jurisdiction to justify our denial of a COA based on an adjudication of the actual merits of the claims. Id. Accordingly, we cannot deny an "application for a COA merely because [we believe] the applicant will not demonstrate an entitlement to relief." Id. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id.

Thus, we reiterate that our immediate task is to determine, not the ultimate merits of Henderson's claims, but only whether Henderson has demonstrated that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484.

We consider first whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. In order to make that determination, it is necessary that we consider the procedural default doctrine. A federal habeas

24

court plainly cannot grant relief where the last state court to consider the claim raised by the petitioner expressly and unambiguously based its denial of relief on an independent and adequate state law procedural ground. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). A state procedural rule is adequate if it is "firmly established" and regularly and consistently applied by the state court. James v. Kentucky, 466 U.S. 341, 348 (1984); Johnson v. Mississippi, 486 U.S. 578, 587 (1988). A state procedural rule is independent if it does not "depend[] on a federal constitutional ruling." Ake v. Oklahoma, 470 U.S. 68, 75 (1985). When the state court expressly relies on an adequate and independent procedural bar, a federal habeas petitioner may not obtain relief unless he establishes cause for the default and actual prejudice. Coleman, 501 U.S. at 750.[4] The existence of cause for a procedural default "ordinarily turn[s] on whether petitioner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986).

1

Adequacy of Texas Abuse of Writ Doctrine

---

[4]A federal habeas petitioner who is unable to make the requisite showing of cause and prejudice can obtain habeas relief if he can show that application of the procedural bar would constitute a miscarriage of justice -- that he is actually innocent of the crime. Henderson does not claim that the actual innocence exception applies in his case.

The district court held that the Texas abuse of the writ doctrine was an adequate procedural bar because it had become "firmly established and regularly followed," citing Ford v. Georgia, 498 U.S. 411, 423 (1991) (quoting James v. Kentucky, 466 U.S. 341, 348 (1984)). The district court also noted that the Texas abuse of the writ doctrine was strictly and regularly applied at the time Henderson filed his first habeas petition on August 28, 1997, citing Emery v. Johnson, 139 F.3d 191, 195, 201 (5th Cir. 1997), and Fearance v. Scott, 56 F.3d 633, 642 (5th Cir. 1995).

For the first time in his COA application in this court, Henderson argues that the Texas abuse of the writ doctrine is not "adequate" to bar review of his claims because his case involves "exceptional circumstances". Because Henderson did not argue in the district court that the Texas abuse of the writ doctrine was inadequate to bar consideration of his claims under the procedural default doctrine, it is unnecessary for us to consider it.[5] See

---

[5]Henderson's current "exceptional circumstances" argument -- that his initial state habeas counsel rendered ineffective assistance of counsel by failing to attempt to talk to Williams and by failing to request a copy of, or an opportunity to review, the State's trial file -- also appears to be inconsistent with the position he took in district court. In the district court, he argued that the evidence he relies on in support of this claim was not available to his initial state habeas counsel because Williams was unwilling to speak to anyone concerning Henderson's case until well after the initial state habeas application was filed, and there was no mechanism by which counsel could have compelled the State to produce its trial file. In his post-hearing brief filed in district court, Henderson argued that his initial state habeas counsel had no reason to suspect that the prosecutors knowingly allowed Williams to lie about his plea agreement and suppressed the true terms of that agreement.

<u>Roberts v. Cockrell</u>, 319 F.3d 690, 694 (5th Cir. 2003) ("We generally will not consider a claim raised for the first time in a COA application.").

Even if we were to consider Henderson's "exceptional circumstances" argument, it does not persuade us that reasonable jurists would find debatable the district court's procedural ruling on the adequacy of the Texas abuse of the writ doctrine. In support of his belated argument, Henderson relies on the Supreme Court's opinion in <u>Lee v. Kenma</u>, 534 U.S. 362 (2002). In that case, Lee claimed that a Missouri trial court deprived him of due process by denying an oral motion for an overnight continuance. Lee had requested the continuance in order to locate subpoenaed alibi witnesses who had been present earlier, but who had left the courthouse without explanation during the trial. Although neither the trial judge nor the prosecutor identified any procedural defect in Lee's continuance motion, the Missouri Court of Appeals held that the denial of the motion was proper because Lee's counsel had not complied with procedural rules specifying the showing required for such a motion and requiring that continuance motions be in writing, accompanied by an affidavit. The Supreme Court held that, under the exceptional circumstances of that case, "the Missouri Rules, as injected into this case by the state appellate court, did not constitute a state ground adequate to bar federal habeas review." <u>Id</u>. at 365. The Court found that four special

27

circumstances existed: (1) at trial, neither the trial court nor the prosecutor referred to the procedural rules relied on by the state appellate court; (2) there was no indication that formal compliance with the rules would have changed the trial court's decision; (3) no published state decision required precise compliance with the rules in the urgent situation presented in Lee's case; and (4) the purpose of the rules was served by Lee's submissions immediately before and at the short trial. Id. at 387.

Henderson argues that perfect compliance with Texas procedural requirements was not possible because his initial state habeas counsel rendered ineffective assistance. Although he had a statutory right to the appointment of competent habeas counsel to represent him in his initial state habeas application, the Texas Court of Criminal Appeals has held that a subsequent habeas claim, based solely on an alleged violation of the statutory right to the appointment of competent habeas counsel in a prior habeas proceeding, is not cognizable on a subsequent habeas application. Ex parte Graves, 70 S.W.3d 103 (Tex. Crim. App. 2002). Henderson therefore contends that he has no avenue of redress other than the federal courts. He contends further that there are no published Texas cases addressing the unique circumstances of his case. Finally, he asserts that the application of the abuse of the writ doctrine to the circumstances of his case eviscerates the doctrine's purpose of ensuring that a death row inmate has one full

28

and fair opportunity to present his claims and the purpose of achieving a balance between the convicted prisoner's constitutional rights and society's interest in the finality of criminal convictions.

Henderson has not demonstrated the existence of "exceptional circumstances" sufficient to persuade us that jurists of reason would find it debatable whether the district court was correct in its procedural ruling that the Texas abuse of the writ doctrine is an adequate procedural bar. It is well-settled that "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief." Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992). Furthermore, "ineffective assistance of habeas counsel cannot provide cause for a procedural default." Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001). As the district court noted, the Texas abuse of the writ doctrine is firmly established and regularly followed, and it was strictly and regularly applied at the time Henderson filed his first state habeas application. Reasonable jurists would not find debatable the district court's ruling on the adequacy of this doctrine.

2

Cause and Prejudice

Regarding Williams's alleged perjured testimony, the district court held that Henderson had not established cause for the procedural default because the evidence showed a lack of due

29

diligence on the part of his initial state habeas counsel, who made no attempt to interview Williams. Even if cause had been shown, the district court found Williams's recantation testimony and accusations against the prosecutors lacking in credibility. The district court noted that the Red River County District Attorney, the Special Prosecutor, and Williams's defense counsel all testified at the federal evidentiary hearing that Williams was an eager witness, who cooperated so that he could get the best possible deal for himself. In his recantation, Williams claimed ignorance of gang activity, parlance, and behavior, and accused the prosecutors of instructing him how to testify about such matters. The district court found that Williams's accusation was not credible, because Williams admitted to observing gang behavior while at the "state school" and in the county jail. The district court also pointed out that Williams's testimony at trial, regarding who was holding the gun when the shots were fired, was consistent with a statement that he gave to the Texas Rangers shortly after the murder, before he spoke with the prosecutors, and before he was offered a plea bargain in exchange for his testimony. The district court therefore concluded that Henderson had failed to show that the prosecutors knowingly sponsored false testimony by Williams.

Henderson made two claims regarding the derivative use immunity provision in Williams's plea agreement: First, that the

prosecution knowingly presented Williams's false testimony that he did not know whether his sentence for the aggravated robbery in Dallas was part of his plea agreement for Lennox's murder; and, second, that the prosecution failed to disclose the existence of the derivative use immunity provision. The district court held that Henderson had failed to establish cause for his procedural default, because he made no showing that an objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. The district court held that the fact that Williams was never tried in the Dallas aggravated robbery case or for the unauthorized use of Lennox's vehicle was known at the time Henderson filed his first state habeas application, and that the other documents uncovered by Henderson to support his claim were also readily available to Henderson's initial state habeas counsel, who failed to exercise due diligence to obtain those documents.[6]

---

[6]The district court held that, even assuming that Henderson could show that the State withheld evidence that would have further impeached Williams, he failed to show that the evidence was material or that the alleged constitutional violation resulted in the conviction of one who is actually innocent. As the district court correctly observed, the evidence against Henderson was substantial:

> He was observed with the accomplices in the murder shortly after the crime, waving the murder weapon in the air in a joyous manner, he was arrested in Dallas shortly after the murder while attempting to retain possession of Ms. Lennox's Cadillac, and he was in possession of the murder weapon at the time of his arrest. At Petitioner's arrest, he had

Henderson argues that he established cause for the procedural default:  The factual basis for his claims was unavailable through the exercise of due diligence.  He asserts that even if his initial state habeas counsel had attempted to interview Williams, Williams testified at the federal evidentiary hearing that he would not have talked to her about Henderson's case.  As the district court observed, however, Williams testified that no one representing Henderson had contacted him prior to his being contacted by the investigator for Henderson's federal habeas counsel.

Henderson argues that Williams's Plea Negotiation Agreement was unavailable to his initial state habeas counsel because it was "secret" and "hidden" in the State's trial file, and there was no mechanism whereby counsel could have compelled the State to produce the file.  He presented no evidence, however, that the agreement was either "secret" or "hidden."  The prosecutors testified at the federal habeas evidentiary hearing that they had an "open file" policy in the case.  Henderson's trial counsel testified that he had no recollection of having been provided a copy of the agreement, but he could not say that he had not received it.  The prosecutor referred to the written agreement in open court at

two ammunition magazines on his person.  One had thirteen bullets in it and the other had ten.  Three shots were made from the gun during the course of Ms. Lennox's murder.  These facts, considered apart from any testimony of co-defendant Williams ..., negate any inference that Petitioner is "actually innocent" of the crime.

32

Williams's rearraignment. Although Williams and his mother testified that immunity from prosecution for the aggravated robbery in Dallas and for the unauthorized use of a motor vehicle charge was part of the agreement, the prosecutors and Williams's counsel testified that those charges were not discussed in negotiating the agreement and were not part of the agreement. Henderson's federal habeas counsel did not ask to see the State's trial file until five days before the federal habeas evidentiary hearing. Henderson presented no evidence that his initial state habeas counsel ever requested a copy of the file or an opportunity to view its contents, much less any evidence that the State would have refused such a request had it been made. As the district court noted, the fact that Williams was not prosecuted for aggravated robbery or unauthorized use of a motor vehicle was known to Henderson's state habeas counsel at the time his initial state habeas application was filed. Thus, the district court's ruling that Henderson failed to show that the factual basis for his claims was unavailable when he filed his first habeas application is not debatable among jurists of reason.

In sum, Henderson has not shown that reasonable jurists would find debatable the district court's ruling that he failed to establish cause for procedurally defaulting these claims. Accordingly, it is not necessary for us to consider whether jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right. See Foster v. Johnson, 293 F.3d 766, 791 (5th Cir.) (when first prong of Slack inquiry for procedural claims is not satisfied, court need not address second prong), cert. denied, 123 S.Ct 625 (2002); Dowthitt v. Johnson, 230 F.3d 733, 753 n.30 (5th Cir. 2000) (same).  Because Henderson has not made a substantial showing of the denial of a constitutional right, we DENY his request for a COA for his claims that the prosecution knowingly presented false testimony and failed to disclose impeachment material.

III

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief and DENY a COA.

AFFIRMED; COA Motion DENIED.

34